CERTIFIED COPY  SEP 9 2004

In the

# United States Court of Appeals
## For the Seventh Circuit

FILED

SEP 09 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 02-2057

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellee,*

and

JAMES M. FERGUSON,

*Intervening Plaintiff-Appellee,*

*v.*

PIPEFITTERS ASSOCIATION LOCAL UNION 597,

*Defendant-Appellant.*

———

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 98 C 1601, 98 C 3217—**David H. Coar,** *Judge.*

———

ARGUED FEBRUARY 28, 2003—DECIDED JULY 1, 2003

———

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* The EEOC brought suit against
Foster Wheeler Constructors, the prime contractor on a
project to construct a recycling plant in Robbins, Illinois,
and a local of the pipefitters union that supplied workers
to Foster Wheeler. The suit, based on Title VII and also on
42 U.S.C. § 1981—but the standards are the same under the

two statutes, at least so far as bears on this case, *Bennett v. Roberts*, 295 F.3d 687, 697-98 (7th Cir. 2002); *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 337-38 (7th Cir. 2002); *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649 n. 1 (4th Cir. 2002)—sought to affix liability to the defendants for the harassment of black pipefitters by their white coworkers. One of the eight pipefitters on whose behalf the EEOC had sued, James Ferguson, intervened in the suit as a plaintiff, as he was entitled to do, 42 U.S.C. § 2000e-5(f)(1), seeking higher damages than those sought on his behalf by the Commission. Foster Wheeler settled, but the case against the union proceeded to a bench trial, which the plaintiffs won. The judge awarded compensatory damages to the EEOC on behalf of the eight black workers totaling $105,000, punitive damages of $50,000, and an injunction against the union's "permitting a hostile work environment based on race to exist for its members at any job site." The union appeals.

The harassment consisted primarily of graffiti scrawled on the interior walls of portable toilets at the construction site—slogans such as "death to all niggers," "your grandmother is such a slut she even fucks niggers," "Fergie [plaintiff James Ferguson], if you don't want to be treated like a nigger, don't act like one," "The shines are ruining this country," and "Fuck Niggers." Additional acts of harassment included the placing of a swastika in a black pipefitter's toolbox, the hanging of a Ku Klux Klan poster in a trailer used by black pipefitters during breaks, and the display of a hangman's noose. That the effect of the graffiti and the other acts, considered together, was to create a hostile working environment for the black pipefitters is not in doubt. The only question is the union's legal responsibility.

Dennis Hahney, the union steward for the Robbins project and also Foster Wheeler's superintendent of pipe-

fitting, and in the latter capacity essentially the superinten-
dent of the pipefitters assigned to the project, was aware
of the graffiti, but he did nothing about them until Fergu-
son complained about the ones that mentioned him.
Hahney responded by ordering a foreman to paint over the
graffiti; and this was done. Hahney testified that if he were
aware of a safety problem he would take action, and
indeed that if he had thought the portable toilets needed
cleaning he would have seen to it that they were cleaned.
But he didn't try to rid the toilets of graffiti. Another union
official, Steven Toth, who also knew about the racially
offensive graffiti, made no effort to eliminate them either,
even though he had on his own initiative ordered the
painting over of a drawing in one of the toilets of a penis
and a vagina because he thought the drawing might be
considered "a little offensive." None of the black pipefitters
complained to the union about the racially hostile environ-
ment created by their white coworkers except Ferguson,
and his complaint was narrowly focused on the graffiti that
referred to him rather than on the ones that referred to
blacks in general.

An employer who is aware of racial or sexual harassment
that is making the workplace intolerable for the targets of
the harassment, and does nothing to correct the situation,
is guilty of violating Title VII. The EEOC argues that when
the harassers and the targets are represented by a union,
the union has exactly the same legal responsibility as the
employer. Objections come quickly to mind. The employer
is in a better position than the union to prevent or elimi-
nate harassment because it can discipline its employees;
the union cannot. If a worker complains to the union that
he is being harassed, all the union can do is file a grievance
on his behalf against the employer; the union cannot elimi-
nate the harassment itself—that is the company's responsi-
bility. Since the employer is both fully liable for failing to

take effective measures against coworker harassment and far better positioned to apply such measures, what is to be gained, except litigation clutter, by imposing the same liability on the union? Foster Wheeler Constructors is a substantial firm and there is no suggestion that the EEOC could not obtain, on behalf of the eight black workers who were harassed, full relief against Foster Wheeler, which it also sued and which settled.

A further consideration is that members of different unions, or union and nonunion workers, often find themselves working at the same site. Although the portable toilets in which racial graffiti were found were intended for the use primarily of pipefitters, other workers had access to and sometimes used them and may have been responsible for some of the graffiti. The pipefitters union had no control over workers belonging to other unions, or for that matter over the portable toilets.

Unimpressed by practical considerations—determined, it seems, to show itself as being as formalistic as any court—the EEOC points to section 703(c) of Title VII, which forbids a union "to exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of his race, color," etc. (emphasis added). It points out that the italicized words are similar to those in section 703(a), which forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color," etc. Therefore, the EEOC reasons, since an employer is guilty of discriminating if it unreasonably fails to correct a problem of coworker harassment, so must the union be. In other words, since the company is legally responsible for harassment by its employees, the union must be legally responsible for harass-

ment by its members (more precisely, by members of the bargaining unit, since the union cannot insist that they become union members), even though they are the same people.

The asserted symmetry between employer and union is spurious. The duties of nondiscrimination imposed by sections 703(a) and (c) have reference to the respective roles of company and union in the workplace. The company, not the union, controls the workplace, including the portable toilets erected at the site for use by the workers. The union is not the company, but the workers' agent in dealing with the company. If it discriminates in the performance of its agency function, it violates Title VII, but not otherwise. Thus a union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination. But if it merely fails to effectuate changes in the workplace—if for example it urges the company to take steps to prevent harassment and the company fails to do so—the union is not guilty of discrimination, though the company is. Notice that if the EEOC were right, the company would be liable for the union's discriminating against black employees in the grievance process.

The separate spheres, and correspondingly different responsibilities with regard to discrimination, of labor and management are blurred in the present case by the curious dual role of Hahney as union steward and supervising pipefitter. It seems doubtful, though the point is not pressed by any of the parties, that he was even legally eligible to be a union steward. In implementation of the National Labor Relations Act's prohibition against company unions, the Labor Board has ruled that a supervisory employee of the company cannot hold a union post that would create divided loyalty and thus undermine the union. *NLRB v. General Steel Erectors, Inc.*, 933 F.2d 568 (7th

Cir. 1991); *Local 636, United Ass'n of Journeymen v. NLRB*, 287 F.2d 354, 361-62 (D.C. Cir. 1961). Hahney's dual role as company supervisor and union steward may have run afoul of this rule, but the only point important to this case is that his dual role makes it unclear whether Ferguson was complaining to him in his capacity as a union steward or in his capacity as a company supervisor. But it is probably the latter. Remember that Hahney ordered a foreman to paint out the graffiti that Ferguson had complained about. When Hahney did this he was acting for the company, because a union official has no authority to order workers to do anything. A union official qua union official cannot order a company foreman to see to it that a portable toilet is repainted any more than he can order the foreman to build a portable toilet.

Ignoring Hahney's anomalous status for the moment, we think the EEOC would if pressed concede that a union is not guilty of discrimination for trying but failing to rectify workplace harassment, and would argue instead that the union must do what it can even if success cannot be guaranteed because the union does not operate the company. But inaction, unless invidious, is not discrimination in any accepted sense of the term. Most people don't take active measures to combat discrimination; their inaction does not condemn them as discriminators. Suppose that a union is lackluster, and while it will file a grievance if pressed to do so by a member of the collective bargaining unit, it will do nothing on its own initiative. We do not understand how such passivity, though it means the union will not take measures to prevent racial harassment on its own initiative, could be thought a form of racial discrimination; yet that is the EEOC's position. Unsurprisingly it has only limited judicial support. (The surprise is that it has any.) *Woods v. Graphic Communications*, 925 F.2d 1195, 1201 (9th Cir. 1991),

says that an affirmative duty to prevent racial discrimina-
tion "may exist," but only *Howard v. International Molders &
Allied Workers Union*, 779 F.2d 1546, 1553 (11th Cir. 1986),
actually imposes such a duty. *Thorn v. Amalgamated Transit
Union*, 305 F.3d 826, 832-33 (8th Cir. 2002), emphatically
denies that there is such a duty; see also *Goodman v. Lukens
Steel Co.*, 482 U.S. 656, 687-89 (1987) (separate opinion).
*York v. American Tel. & Tel. Co.*, 95 F.3d 948, 956-57 (10th
Cir. 1996), while holding that a union may not "acquiesce"
in the employer's unlawful discrimination, states that
"mere inaction does not constitute acquiescence," though
it is unclear what the court means by "mere inaction."

An affirmative duty of the union to investigate and rec-
tify discrimination by the employer derives no support
from the statutory language, as we have seen, and fills no
gap in the remedial scheme that the statute creates. Impos-
ing such a duty would make for factually messy cases be-
cause the union's power is so much more limited than the
employer's when it comes to making changes in personnel
or work rules. (More precisely, because, so far as the evi-
dence suggests, *this* union's power over personnel and
work rules is so much more limited than the employer's;
other unions, operating under other collective bargaining
agreements, might be delegated additional powers that
would alter the analysis in this opinion.) Suppose only one
worker is harassing blacks. The union is not his employer
and cannot fire him, so the question would be whether it
had done all it could to get the company to fire him, and
that will often be an impossible question to answer by the
methods of litigation. There is also the awkwardness of
asking the union to take sides in a dispute between two
employees both of whom it has a statutory duty to repre-
sent fairly in any disciplinary proceeding by the employer.

For all these reasons, we reject the EEOC's contention
that unions have an affirmative duty to prevent racial ha-

rassment or other forms of unlawful discrimination in the workplace. But this conclusion does not resolve the case because the district court had, and the EEOC defends, an alternative ground for deciding the case against the union. The ground is that the union's inaction was selective. The union would take the initiative to solve other problems in the workplace, just not racial harassment.

Evaluation of this argument requires us to distinguish among several types of case in which selective inaction by a union might be thought a form of discrimination. In the first, the union is vigilant to detect and correct mistreatment of white workers but has a policy of ignoring the interests of black ones. If a black worker asks the union to grieve a complaint, the union refuses, though if the worker were white the union would grieve his complaint. This is a clear violation not only of section 703(c) of Title VII, *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 284-85 (1976); *York v. American Tel. & Tel. Co.*, *supra*, 95 F.3d at 956, but also of the union's duty of fair representation of all members of the collective bargaining unit, a point settled by the Supreme Court many years before Title VII was enacted. *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 202-04 (1944).

In the second type of case, the union is not bigoted, but it has decided as a matter of policy not to grieve complaints of discrimination by black members of the bargaining unit because the company is hostile to such complaints and the union fears that this hostility will make it harder for the union to succeed in its dealings with the company. This the Supreme Court held to be a form of discrimination in *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987). It was an easy case, because it has never been a defense to a charge of discrimination that the discriminator was not actuated by racist or other invidious motives, but may just

have been trying to maximize his profits, pursuant to the maxim that the only color that interests a businessman is green. It is not a defense for a shopkeeper who refuses to hire blacks that the only reason he does so is that his customers don't like blacks.

In a step beyond *Goodman*, suppose a union adopted a policy of not assisting workers who complain about racial or sexual harassment, whether they are white or black, male or female. The union believes that these workers have other remedies and that union intervention would unduly complicate the union's role in dealing with the employer on behalf of all the workers composing the bargaining unit. Nevertheless it might be argued that, though unresponsive not to the interests of particular minorities such as its black workers or other protected groups as such but merely to the class of worker complaints that consists of complaints about discrimination, the union is refusing to take discrimination seriously and to that extent acquiescing in or at least condoning it by signaling to both the employer and the employees its belief that discrimination is not a serious problem. Cf. *Salvadori v. Franklin School District*, 293 F.3d 989, 998 (7th Cir. 2002); *Marquart v. Lodge 837, International Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 853 (8th Cir. 1994).

This is a tenuous theory of discrimination, and even more tenuous is a theory that would find discrimination in a fourth type of case, one in which there are no complaints but the union is proactive (i.e., takes the initiative) when it comes to safety and other matters, perhaps even to some forms of discrimination, while adopting a passive stance with regard to racial harassment. This fourth category takes us far beyond *Goodman*. The argument for liability in this class of cases would be that a union that is assiduous in assisting the workers whom it represents with some

types of problem but indifferent to problems of racial discrimination is treating such discrimination as something unimportant, and to that extent, once again, is acquiescing in or condoning it. Suppose the reason Toth ordered the drawing of the penis and the vagina effaced, without his having been prompted to do so by a complaint from anyone, was that he was trying to prevent sexual harassment. It could be argued that by failing to do the same with regard to racial graffito he would be signaling a belief that racial discrimination is less serious than sex discrimination. This could be thought to belittle the long and still continuing struggle of black Americans against racism. And, signals aside, the hard fact would be that blacks were getting less protection from the union than women were, and arbitrarily different treatment is the essence of discrimination. The objection to this theory is that uneven remediation of different forms of discrimination may reflect nothing more than a need to determine priorities so that limited resources can be concentrated on the most urgent problems of discrimination facing a particular employer (or union) at a particular site at a particular time, as in *Schroeder v. Hamilton School District*, 283 F.3d 946 (7th Cir. 2002); see *id.* at 958 (concurring opinion). But we need not pursue the issue further. There is no evidence that Toth was concerned about sexual harassment when he ordered the deletion of the off-color drawing. Indeed, there is no indication that any of the pipefitters on the Robbins project were women.

What the EEOC is left to argue is that the fact that Toth once showed initiative with respect to a workplace problem, acting without waiting for a complaint to efface the sexual graffito, and that Hahney acknowledged that if he noticed a dirty toilet he might order it cleaned up and if he noticed a safety problem he would try to solve it even if in neither case a worker complained, is evidence of a policy

of subordinating racial to other workplace problems. The evidence is insolubly ambiguous. Toth's single act of self-activated intervention was not an assumption by the union of responsibility to police the Robbins project for any and all workplace problems and take action if it noticed one. This single act could have created no reliance reasonable or otherwise on the part of the black pipefitters that they would have no need to complain about harassment—that the union would act without any prompting.

The interpretation of Hahney's conduct is fogged by his anomalous dual role. When he said he would order a dirty toilet cleaned up or a safety problem attended to, it is unclear whether he would be doing so as a union steward or as a company supervisor. But the latter is the more likely interpretation because, as we noted earlier, while a union steward could complain to the company about a dirty toilet, he couldn't order it cleaned up.

We are miles from *Goodman*, where the union refused as a matter of policy to grieve complaints about discrimination against black members of the bargaining unit. The pipefitters union had no such policy. The case would be no different in any realistic sense had Toth left that drawing alone. The union qua union did very little other than in response to complaints—too little in our view to justify the district judge's inferring a policy of treating discrimination problems differently from other workplace problems, even if that were a viable basis for liability.

The judgment is reversed with instructions to enter judgment for the union.

REVERSED.

ROVNER, *Circuit Judge*, dissenting. My colleagues' analysis is premised on the notion that the union has no control over workplace conditions and so lacks the authority to deal with workplace harassment of the kind proven in this case. *E.g., ante* at 5 ("[t]he company, not the union, controls the workplace"). Confining liability to the company on that basis has the appeal of simplicity, but it may not always comport with reality. My brothers themselves leave room for the possibility that a collective bargaining agreement might confer upon a union sufficient power vis-à-vis personnel assignments and work rules to expose the union to liability for workplace discrimination. *Ante* at 7. Authority is not always conveyed formally, however (*see, e.g., Kujawski v. Board of Commissioners of Bartholomew County, Ind.,* 183 F.3d 734, 739-40 (7th Cir. 1999) (policymaking authority); *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865-66 (7th Cir. 1998) (agency principles)), and we should not close our eyes to the realities of the workplace, particularly in view of the broad remedial purposes of Title VII and section 1981 (*see, e.g., Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437, 88 S. Ct. 2186, 2202 (1968), quoting *United States v. Price,* 383 U.S. 787, 801, 86 S. Ct. 1152, 1160 (1966); *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 889 (7th Cir. 1996)). Where the facts reveal that, in practice, the union enjoys significant control over working conditions and has the power to correct workplace inequities, it is appropriate to hold it liable for failing to do so on the same basis as the employer.

The evidence in this case permits the inference that the pipefitters' union in fact did have control over significant aspects of the Robbins workplace, including the ability to address precisely the type of discrimination at issue here. The person who functioned as the union steward, Dennis Hahney, was also the piping superintendent for Foster

Wheeler. As such, Hahney hired pipefitters for the Robbins project (R. 290-2 at 417), chose foremen and everyone else in the chain of command beneath him (*id.* at 429), decided whom to lay off when workforce reductions were necessary (*id.* at 418, 501-02), laid out the work for pipefitters to be completed at any given time (*id.* at 418), doled out work assignments (*id.* at 459-60), walked the job site to see that pipe was being installed as planned (*id.* at 473), made sure that everyone had a safe work environment (*id.* at 439), and strove to maintain "some sort of semblance of peace" among the pipefitters (*id.* at 471). It was Hahney's responsibility to see that things ran smoothly between the company and the pipefitters (*id.* at 418) by, among other things, ensuring that none of the pipefitters was "hassle[d]" (*id.* at 421). Hahney's testimony makes clear that he had at least some power to resolve workplace issues on his own. He testified, for example, that he would have acted independently to remedy any safety problem he noticed. *Id.* at 439. His testimony also suggests that his authority extended to the conditions of the portable toilets at the Robbins project that were the situs of the graffiti underlying the plaintiffs' harassment claim. Although those toilets were leased by Foster Wheeler and were cleaned by the contractor that supplied them, Hahney testified that he would have taken steps to have them cleaned if necessary (*id.* at 423, 489); indeed, on one occasion when workers were tracking snow into the toilets, he arranged for laborers on the job site to clean them out (*id.* at 461-62). So the notion that Foster Wheeler had exclusive control over the toilets and thus the sole authority to deal with the graffiti is an illusion. Lest there be any doubt on that score, one need only recall that when the union's business agent, Steven Toth, noticed sexual graffiti in one of toilets that he thought "might be a little offensive" (R. 290-3 at 514) he took the initiative to have it dealt with (*id.* at 513-15). Moreover, when Toth

No. 02-2057

learned that pipefitter James Ferguson had complained about some of the racial graffiti in the toilets, Toth immediately turned to Hahney and admonished him, "[W]e can't stand for that. If there's anything like that in the port-a-johns, see your powers to be and have the laborers paint them over." *Id.* at 517. Although Toth opined on the witness stand that "[i]t was Foster Wheeler's job to get rid of [the graffiti]" (*id.* at 518), his conduct and his remarks to Hahney suggest that the responsibility in fact was not Foster Wheeler's alone and that the union did not treat it as such.

On these facts, it was a fair inference that the union had the power to deal with the racially-charged graffiti defacing the toilets, but intentionally acquiesced in the harassment rather than exercising its authority to remove the graffiti. That is precisely the inference that Judge Coar drew after hearing the evidence, and I can see no clear error in that assessment. After all, it is undisputed that Hahney, at least, was aware of the rampant graffiti on the walls of the toilets. *See, e.g.,* R. 290-2 at 423, 426. The offensive character of that graffiti was obvious. As Judge Coar put it, "Only a visitor from another planet would fail to understand the ugliness of what was written and drawn on those walls." 2002 WL 976618, at *7. The evidence does not bespeak a perception by union officials that they were powerless to act. Again, Hahney expressed no reservation about taking independent action to correct a workplace safety problem or to clean up a dirty toilet, and Toth *did* act to have sexually-charged graffiti removed from one of the toilets, recognizing its offensive character. Given the union's evident willingness and ability to address sexual graffiti, it is an entirely fair and permissible inference that the union was deliberately indifferent to the rampant racial graffiti that defaced the toilets.

Only if we dismiss the authority exercised by union officials such as Hahney and Toth can we say that there was no basis for imposing liability on the union. My colleagues reason that when union steward Hahney was dealing with personnel and work issues, he was acting for the company, not the union, and so could not expose the union to liability for his failure to redress the graffiti problem. *Ante* at 6, 11. This neat division of Hahney's two roles strikes me as artificial, however. Hahney's own testimony reflects no such bisection of his responsibilities. *See, e.g.,* R. 290-2 at 418-20; 2002 WL 976618, at * 4 ¶ 60. It may well have been inappropriate for the union to make Hahney its steward given his management responsibilities. *Ante* at 5-6. Whether that decision was well thought out or not, anomalous or not, we do not know. But having placed a management official in the role of union steward, the union ought to bear the consequences—good and bad—of that decision. Hahney's testimony suggests that in his dual role, he had the authority to address the graffiti. Toth's testimony about removing the sexual graffiti confirms that union officials not only could but on one occasion *did* take initiative to remediate this type of problem. Toth's initiative on that occasion may not, by itself, establish that the union had assumed responsibility to correct any and all workplace problems (*see ante* at 10-11), but coupled with Hahney's testimony it at least belies the notion that the union lacked the power to address the graffiti that defaced the toilet walls. The union's *de facto* authority—unexercised despite the patently offensive nature of the graffiti—supports the district court's decision to impose liability on the union.

We need not wring our hands in worry about the awkward position in which a union might find itself if we obligate unions to take action where some of its members are harassing or otherwise discriminating against other mem-

bers, as apparently was the case here. *See ante* at 7. Unions already are called upon routinely to navigate a thorny path between the clashing interests of their members. *See, e.g., Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 833 (8th Cir. 2002) ("When the employer investigates a sexual harassment claim by one union member against another, the union has a statutory duty to fairly represent both in their disciplinary dealings with the employer."). My colleagues may be correct in holding that, as a general rule, unions have no affirmative duty to prevent discrimination in the workplace. But it seems to me that a union may nonetheless take on that obligation if, as the facts suggest was true at the Robbins project, union officials assume responsibility for the type of workplace conditions that later give rise to a discrimination claim. Having voluntarily crossed the boundary separating the company's domain from the union's, *see ante* at 5, the pipefitters' union was not free to turn a blind eye to the racial graffiti that was staring its officials in the face.

I respectfully dissent.

A true Copy:
   Teste:

_____
Clerk of the United States Court of
Appeals for the Seventh Circuit